## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

       Plaintiff,

       v.                                Case No. 19-20076-JAR

WARREN RICHARDSON,

       Defendant.

---

## MEMORANDUM AND ORDER

This matter comes before the Court on the government's Motion in Limine (Doc. 87) and Defendant Warren Richardson's Motion in Limine by (Doc. 89). The Court conducted a two-day evidentiary hearing on the motions on November 8–9, 2023. The Court has considered the evidence and argument presented at the hearing, as well as the parties' briefs, including their post-hearing supplemental briefs, and is now prepared to rule. For the reasons detailed below, the Court grants in part and denies in part both motions.

### I.    Factual Background

Defendant Warren Richardson is charged in a four-count Indictment with: (1) conspiring to distribute cocaine base and possess with intent to distribute cocaine base from on or about June 1, 2014, to on or about December 17, 2014; (2) unlawfully possessing a 7.62x39mm rifle on or about December 13, 2014, after having been previously convicted of the felony crimes of possessing with the intent to distribute cocaine base within 1000 feet of a school and using or carrying a firearm in furtherance of drug trafficking; (3) on or about December 17, 2014, possessing with intent to distribute cocaine base; and (4) on or about December 17, 2014, using or carrying a 7.62x39mm caliber rifle in furtherance of drug trafficking.

During a two-day hearing on the parties' motions in limine, the government presented evidence of: the drug trafficking conspiracy of Richardson and others, including their sales or attempted sales of cocaine base (crack cocaine) from June to December 2014, their possession of firearms as part of the conspiracy; the December 13, 2014 murder of the informant who made controlled buys from Richardson and the coconspirators; Richardson's acts evading arrest on state court charges for this activity; Richardson's armed robberies on December 17, 2014, including his subsequent apprehension within two hours after the robberies and the evidence seized incident to that arrest.

For the limited purpose of deciding the motions in limine, the Court makes the following findings of fact based on the evidence presented at the limine hearing, pursuant to Fed. R. Evid. 104(a), which tasks the court with deciding any preliminary questions such as whether evidence is admissible. In doing so, Rule 104 provides that the court is not bound by the rules of evidence, except those on privileges.[1] In this case, there are several categories of evidence that Richardson argues are inadmissible hearsay. But Rule 104 allows the Court to consider inadmissible evidence in making preliminary rulings on evidence that the Court concludes is admissible.[2] Therefore, the following findings of fact are based on all of the evidence presented at the hearing, even though some of that evidence may not be admissible in the jury trial. These findings are made strictly to determine the preliminary questions in this case on admissibility.

Kansas City, Kansas police officers utilized a paid confidential informant ("informant" or "CI") in 2014 to investigate Richardson and others they believed were engaged in a conspiracy to distribute crack cocaine. Between June 3, 2014 and August 19, 2014, the informant purchased

---

[1] Fed. R. Evid. 104(a).

[2] *Id.*

crack cocaine from Richardson and others in controlled buys at the direction of police officers. For every controlled buy or attempted controlled buy, officers equipped the informant with an audio/video recording device ("recorder") that they secreted on his body and which continuously recorded until officers removed the recorder immediately after the transaction or attempted transaction was completed.  Officers also provided the informant with the money to purchase the drugs.  Officers immediately took custody of the drugs and recorder from the informant after each transaction or attempted transaction.  Officers surveilled the informant walking to and from the premises or vehicles in which the drug transactions occurred; they were not able to surveil him while he was inside the premises or vehicles.  But, before, during, and after the controlled buys, officers listened to a live audio feed from the recorder, including while the informant was out of their eyesight.

While the recorder captured the faces, movements, and interactions of various individuals in the premises and vehicles where the drug transactions took place, the recordings do not always clearly depict the hand-to-hand transactions.  And though the recorder captured the conversations or statements of the informant and those he interacted with or those in close proximity, the conversations are not always clearly audible or fully comprehensible.  Nonetheless, Richardson is visible and all or some of his statements are audible on recordings of the June 3, June 5, and July 25 buys.

On June 3, the informant first attempted a controlled buy from individuals at 1047 Quindaro, but they had no supply.  Brandie Brownlee offered to take the informant's money to buy drugs at a location a few blocks away.  The informant declined Brownlee's offer and instead walked to another location, 1320 Georgia, where he conducted the first controlled buy in this investigation.  The recorder continuously recorded the informant, including his walk from 1047

Quindaro to 1320 Georgia. The recording for this first buy on June 3 depicts Richardson and Durayl Vann standing within inches of each other as the informant purchased crack cocaine from them. There were others in the house and depicted on the video, but they did not appear to be directly involved in the transaction. It appears that Vann handed the drugs to the informant, while Richardson conversed with the informant within inches of Vann and the informant. The informant later told officers that Richardson appeared to be the main seller and that Richardson had handed the cocaine to Vann, who in turn handed it to the informant. Later that same day, the informant made another controlled buy of crack cocaine from Richardson at 1320 Georgia. Vann and others were present during this buy.

Two days later, on June 5, the informant made another controlled buy of crack cocaine from Richardson at 1320 Georgia. Richardson provided the informant with a phone number during this transaction. Richardson's probation officer later confirmed that this was the phone number Richardson provided to her as his contact number.

The fourth sequential controlled buy occurred on June 10, when the informant purchased crack cocaine from Vann at the 1320 Georgia location. The recording depicts others present, including a man who appeared to be cutting cocaine on a counter. Richardson was not present during this transaction. Vann provided the informant with his phone number during this transaction. Phone toll records further revealed that during the drug investigation by the Kansas City, Kansas Police Department ("KCKPD"), spanning June 2014 to August or September 2014, there were 14 phone contacts between Vann and two of Richardson's phone numbers.

The next day, June 11, the informant unsuccessfully attempted a controlled buy of crack cocaine from Vann at 1320 Georgia because Vann was selling only small pieces. The informant observed Donnell Hall present, holding a rifle. The next day, June 12, the informant again

attempted a controlled buy of crack cocaine at 1320 Georgia, but Vann was not present. The informant told officers that he observed a rifle laying on the couch.

On June 24, the informant made a controlled buy of crack cocaine at 1320 Georgia, this time from multiple sellers who pooled their supply to provide the informant with the quantity he requested. These sellers were Jason Trevillion, Hall, Dyran Robinson, and Brandee Brownlee. Richardson was not present during the June 24 transaction.

Sometime between June 24 and July 2, the landlord of 1320 Georgia evicted the tenant, Brownlee, following shootings that occurred there on June 15 and June 27. The June 27 incident was a double shooting. The victims of this second shooting were Robinson and John Jackson. Brownlee was present at the time of the shooting and Richardson arrived after the shooting while officers were still investigating the crime scene.

Twice on July 2, the informant made controlled buys from Trevillion inside a vehicle parked in front of 1727 Cleveland. In both transactions Trevillion sat in the driver's seat. In the first transaction Hall sat in the passenger seat, and in the second transaction Hall stood outside the car, displaying a handgun tucked in his waistband. Phone toll records revealed that, during the KCKPD's drug investigation spanning June 2014 to August or September 2014, there were 54 phone contacts between Trevillion and one of Richardson's phone numbers.

On July 25, the informant made a controlled buy of crack cocaine from Richardson at a different location, 2305 N. 56th St. Richardson was alone during this transaction. Richardson exhibited suspicion of the informant during this transaction, asking the informant how he travelled to the location and who he was with. The informant told Richardson he had rode on a metro bus. Richardson stepped outside of the house to look around. Richardson also seemed to detect something on the informant's body, perhaps something associated with the recording

device.  The informant, who was a cancer patient, assured Richardson that it was his chemotherapy port.

July 25 was the last drug transaction between the informant and Richardson.  After July 25, at the direction of officers, the informant made several recorded phone calls to Richardson about buying PCP.  Twice on July 29, in recorded phone conversations, the informant spoke to Richardson about buying PCP.  In a recorded phone conversation on July 30, Richardson told the informant that "it was all bad," and he couldn't figure it out.  In an August 12 recorded phone conversation Richardson told the informant that he was no longer selling.  The informant subsequently saw Richardson at a funeral, and in an unrecorded conversation, Richardson told the informant he could buy from Tyree Cole.

Acting at the direction of officers, the informant immediately contacted Cole and made controlled buys from Cole and Cole's girlfriend, Benaranda Brown, at a McDonald's Restaurant on August 15, 16 and 19.

By July 30, when Richardson told the informant "it was all bad," and he couldn't figure it out, Robinson had been booked into the county jail; the record does not indicate what he was charged with at that point.  By September 3, however, charges were being filed in state court against some of the coconspirators based on their sales to the informant.  Cole and Brown, who had just sold to the informant in August, were arrested on charges for those sales on September 3.  Trevillion and Hall were arrested on October 17 on charges for their sales to the informant in June and July.  Vann and Richardson were charged in the same complaint with sales to the informant.  Vann was arrested on these charges on October 1.  Richardson, as detailed below, was not arrested until December 18.

The affidavits in support of these various arrest warrants set forth extensive detail from which the conspirators could reasonably glean the identity of the informant.  First, in each affidavit, the informant is referred to by the same identifier, CI #1316.  Second, for each sale, the affidavit details the date of the sale; the exact location or the description of the vehicle in which the sale occurred; the quantity, substance, and price of the controlled substance sold; and some affidavits detail how the sale was set up through specific phone calls.  There is less detail in the warrants, but the warrants do disclose the dates of sales, and sometimes the location.

The parties presented conflicting evidence about whether or when those arrested had access to the detailed affidavits.  Whether they had access shortly after their arrest, or only later upon discovery request by their attorneys is not clear.  Richardson maintains that the protocol in that state court is that affidavits are released only when requested by the party in discovery, and this would be evident through docket filings.  But there is also evidence that there were technical issues with that court's electronic filings such that the docket filings may not evidence when those arrested received access to the affidavits.  At the least, those arrested received the arrest warrants on the dates they were arrested.

There is no direct evidence or jail call records evidencing phone calls between those arrested and Richardson, who remained at large until December 18.  But there is other circumstantial evidence that Richardson was aware that there was a pending warrant for his arrest on joint charges with Vann, who was arrested on October 1.  On September 13, officers went to arrest Richardson at 2305 N. 56th Street, the location of the last controlled buy between Richardson and the informant.  Richardson saw the officers approaching, ran inside the house, and refused to come outside despite their oral commands.  One officer saw Richardson attempt to flee out the back door.  Thereafter, in September and beyond, Richardson violated the terms of

his supervised release by ceasing all contact with his probation officer in the District of Kansas (on his prior federal drug and firearms convictions).

Richardson was finally arrested in the early morning hours of December 18.  But he tried to elude officers on that date as well, taking them on a high-speed chase, driving a car he had stolen minutes before, in speeds exceeding 70 mph, on snow-packed residential streets in Kansas City, Kansas.  This high-speed chase and arrest occurred shortly after Richardson had committed two armed robberies late on the night of December 17.  Sometime between 10:00 and 10:15 p.m. on December 17, Richardson robbed victim R.S. at gunpoint of $400.  R.S. was able to identify Richardson, who he had known since childhood.  R.S. described Richardson's weapon as a black assault rifle and said when he expressed surprise that Richardson would rob him, Richardson responded, "you don't think I will shoot you?"  R.S. stated that after robbing him, Richardson got into a dark car that had a muffler problem; and that the driver of that car and Richardson departed.   About 45 minutes later, and about six blocks away, a second victim, M.R., was robbed by Richardson, who was armed with a long, black rifle.  Richardson took M.R.'s wallet and his vehicle, a Chevrolet Tahoe.  Richardson later admitted to participating in these robberies, entering a nolo contendere plea in state court, and stipulating to these robberies at the hearing to revoke his federal supervised release.

Within minutes after this carjacking, a Kansas City, Kansas police officer responding to a shots-fired call, gave chase to the Chevrolet Tahoe, which had by then been reported stolen. When officers were able to use spike sticks to force the vehicle to stop, Richardson, who was driving, and his passenger, Tyrone Hamilton, unsuccessfully attempted to flee on foot.  When an officer caught him, Richardson hit the officer with the officer's baton and gave a false name.

In addition to recovering M.R.'s wallet and R.S.'s money, officers recovered from the stolen Chevrolet Tahoe that Richardson was driving: a baggie containing approximately 5 ½ grams of cocaine base, a bottle of PCP, and three hand-rolled cocaine cigarettes, two of which conclusively had Richardson's DNA on them. They also recovered a long, black assault rifle; specifically, a Yugo 7.62x39mm caliber SKS assault rifle. This firearm was wedged between the front console and the passenger's seat, within easy reach of right-handed Richardson and his passenger Hamilton.

Forensic ballistic examination revealed that toolmarks on four cartridge cases test-fired from this recovered firearm matched 15 of 16 cartridge casings recovered from the scene of a murder that occurred on December 13, five days before Richardson's apprehension. The ballistics examiner further testified that toolmarks on the sixteenth cartridge showed that it had cycled through the recovered firearm, rather than being fired.

In the early morning hours of December 13, the informant who made all of the controlled buys in this case, was murdered by a lone gunman. The gunman killed the informant by multiple gunshots immediately after entering the front door of the informant's residence. The informant's girlfriend and young son could only provide a general description of the gunman. Both said it was a black male who they did not recognize by sight or voice. Both said the gunman entered the house asking, "where's Tracy," the first name of the informant. The girlfriend described the gunman as having a deep, raspy voice; the son described the gunman as having a deep voice. The son described the gunman as being taller than his father; he said his father came up to the gunman's chin. Booking records establish that Richardson is 6 feet tall; the informant is 5'8 or less, according to other records. The gunman presumably was wearing shoes; the crime scene photos show the deceased informant was barefoot. The informant's young son described the

murder weapon as looking like an AK, something he was familiar with from playing video games. The girlfriend said that the gunman immediately left, and she heard a car with a loud muffler outside. A man sitting in a parked car down the block from the informant's residence told officers that he heard a loud car coming, he heard shots, yelling and screaming, and then saw a tall man running down the front stairs and entering the passenger side of a dark-colored car with a loud muffler and speeding off. Officers were not able to obtain sufficient samples of DNA or fingerprints on the door of the informant's house.

At the time of the murder, Vann, Cole, Brown, Trevillion, and Hall were in custody. Only Brownlee, Robinson, and Richardson were not in custody. Brownlee is a female of small stature and does not match the general description of the shooter. Robinson is very tall and very thin and also does not match the general description of the shooter. Richardson, a 6 foot tall black male weighing 190 pounds does match the general description of the shooter.

## II.   Discussion

The government moves to admit and Richardson moves to exclude numerous categories of evidence, some of which overlap. Generally, the parties' motions in limine fall into three broad categories: (1) motions under Fed. R. Evid. 401, 402, 403, and 404(b); (2) motions relating to authenticity rules; and (3) motions under the hearsay rules. The Court addresses each category in turn.

### A.   Motions Under Fed. R. Evid. 401, 402, 403, and 404(b)

Common and individual issues raised in the parties' motions in limine under these rules are the admissibility of: (1) Special Agent Jonathan Speath's testimony, which Richardson characterizes as false or misleading; (2) evidence of Richardson's prior felony convictions, incarceration and detention, and pending charges in D. Kan. Case No. 22-cr-20054-DDC; and (3)

other evidence that the government characterizes as intrinsic to the charges or alternatively as proper 404(b) evidence.

Evidence is relevant under Fed. R. Evid. 401, if "it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action."  And relevant evidence is admissible unless provided otherwise under the law.[3]

Under Rule 403, the Court must also determine whether the evidence's "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[4]  "Unfair prejudice" under the rule means "an undue tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one."[5]  "In engaging in the requisite balancing, [the Court] 'give[s] the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value.'"[6]  And the Court must remain mindful that "it is not enough that the risk of unfair prejudice be greater than the probative value of the evidence; the danger of that prejudice must *substantially* outweigh the evidence's probative value."[7]  Exclusion under Rule 403 "is an extraordinary remedy and should be used sparingly."[8]

The Court discusses each category of evidence at issue, analyzing its relevance and admissibility under the various bases offered by the government.  The Court also analyzes each

---

[3] Fed. R. Civ. P. 402.

[4] Fed. R. Evid. 403.

[5] Fed. R. Evid. 403 advisory committee note.

[6] *United States v. Cerno*, 529 F.3d 926, 935 (10th Cir. 2008) (quoting *Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1274 (10th Cir. 2000)).

[7] *United States v. Henthorn*, 864 F.3d 1241, 1256 (10th Cir. 2017) (quoting *Cerno*, 529 F.3d at 935).

[8] *United States v. Silva*, 889 F.3d 704, 712 (10th Cir. 2018) (quoting *United States v. Tan*, 254 F.3d 1204, 1211 (10th Cir. 2001)).

category of evidence under Rule 403 and determines that the probative value of all of the evidence at issue in this Order substantially outweighs its prejudicial effect.  In other words, the evidence, if otherwise admissible, is admissible under Rule 403.

### 1. Special Agent Jonathan Spaeth's Testimony

Special Agent Spaeth testified before the grand jury that the conspirators were likely aware of the identity of the informant before he was murdered on December 13, 2014.  In his testimony, Spaeth explained to the grand jury how someone who is charged with a crime in state or federal court receives discovery, including police reports and recordings.  Spaeth implied that, prior to the informant's murder, the conspirators would have learned the identity of the CI through information in arrest warrant affidavits and discovery in their criminal cases in state court.  Richardson had not been arrested on the warrant and was not otherwise in custody on December 13, but most of the coconspirators had been arrested and detained.

Richardson claims that Spaeth testified falsely because Spaeth did not know when discovery was disseminated to the defendants, and there are no docket entries indicating that discovery was requested and provided under the local rules and typical protocol in Wyandotte County District Court.  Richardson further argues that because there is no evidence that the coconspirators made calls from the jail to Richardson's known phone number, there is no evidence that any of them apprised Richardson of the content of their arrest warrant affidavits.  Richardson asserts that because Spaeth's testimony before the grand jury was false and misleading, the Court must "prohibit the government from compounding this unfairness by eliciting similar testimony at trial that will mislead and unduly prejudice the jury."[9]

---

[9] Doc. 89 at 4–5.

Spaeth's testimony was based on his understanding state court practice and based on his investigative experience as a former police officer, his experience as a federal agent, and his interactions with law enforcement in the Kansas City metropolitan area.  Spaeth testified that the state court issued arrests warrants on Defendant Richardson and the others in September and October 2014.  Spaeth testified that each of the affidavits in support of the arrest warrants detailed the date, location, drug, amount, and price for each drug sale and that each affidavit identified the same informant, "CI #1316."  The affidavit for Cole and Brown included color photographs from buys on August 15 and 16, 2014.  The affidavit for Richardson and Vann mentioned that during the transaction CI#1316 handed a single piece of cocaine to an unknown male which is a common practice as a reward for facilitating a drug purchase.

Given the detail in the arrest warrant affidavits, Spaeth could have drawn the reasonable inference that sometime between September and December 13, 2014, some or all of the coconspirators had learned, or at least inferred, the identity of CI #1316.  Richardson admits that although the state court records typically reflect when defendants request and obtain discovery, including arrest warrant affidavits, sometime prior to October 25, 2023, the state court was experiencing technical issues that made past dockets temporarily unavailable.  Therefore, Spaeth reasonably determined it is more likely than not that by December 13, the coconspirators, who had been arrested and detained since September and October, had discovered the affidavits supporting their arrest warrants.  To the extent Spaeth's testimony was misleading in that it suggested the coconspirators knew and communicated this information to Richardson, it was not intentionally misleading.

The Court will not exclude Spaeth's testimony, including but not limited to the details in the affidavits, the persons against whom the warrants were issued, and the dates of the warrants.

Of course, there is no evidence that Spaeth has personal knowledge that Richardson and the coconspirators *knew* the identity of the informant before the date of his murder, so Spaeth is prohibited from testifying to that.

Although Spaeth obtained records of jail calls from Vann, Cole, and Hall and found no calls to Richardson's number, there are certainly many other ways in which information could have been communicated to Richardson, either directly or indirectly.  The government presented circumstantial evidence at the hearing suggesting Richardson was aware that there was an arrest warrant for him—he eluded officers on September 13, eluded his probation officer thereafter, and attempted to elude officers on December 18.  Richardson's state of mind and intent is at issue on all of the charges in this case.  Therefore, the circumstantial evidence of knowledge and intent is either intrinsic to the conspiracy, drug, or firearms charges, or is evidence of other crimes, wrongs, or acts that is probative on the issue of intent and admissible under Rule 404(b).  Furthermore, the evidence is more probative than prejudicial under Rule 403.  It is highly probative, as the charges against Richardson and the others in state court are buys that are alleged as overt acts in the conspiracy charge in this case.

For the same reason, the Court finds unavailing Richardson's argument that evidence of buys from others is inadmissible.  Richardson is charged with a conspiracy that includes overt acts committed by conspirators, including drug sales.  This evidence is highly probative of the conspiracy charge.

This evidence is also probative of the felon-in-possession charge in this case, which charges Richardson with possessing on December 13, the date of the murder, the same firearm that was recovered on December 18.  While it is unclear to this Court whether the government's evidence about Richardson's possession of the firearm on December 13 is based in whole or in

part on the murder, the circumstances tying Richardson to the murder weapon, if not the murder, are probative of the felon-in-possession charge on that date. The probative value of this evidence substantially outweighs the prejudicial effect.

Finally, Richardson takes issue with Spaeth's testimony that the cases involving Vann, Cole, Brown, Trevillion, Hall, Brownlee, and Robinson were resolved before the December 13 murder.  But the government explained that by "resolved," Spaeth meant that these individuals had been charged and/or apprehended by that date, not that their criminal cases had been finally adjudicated.  Spaeth's testimony to the grand jury was neither false, nor misleading on this or on the other point.  Richardson's motion to exclude his testimony is therefore denied.

### 2.     Evidence of Richardson's Prior Felony Convictions, Incarceration, Detention, and Pending Charges in Case No. 22-cr-20054-DDC

Defendant seeks to exclude "evidence of any suspected acts referenced in the discovery in this case that are irrelevant to the charges" against him of drug distribution or possession of firearm under Rule 404(b)(1).[10]  The Court cannot rule on such a generic request for exclusion of evidence.  To the extent Richardson is referencing evidence about the charges currently pending in another Case No. 22-cr-20054-DDC, the government states that it "does not intend to elicit testimony in its case in chief about the charges currently pending" in that case.[11]  The government further acknowledges that it will not introduce "evidence in its case in chief regarding any other crimes or bad acts the defendant has committed while incarcerated."[12]  The Court rules that evidence concerning Defendant Richardson being currently detained on the charges in this case is also inadmissible.

---

[10] Doc. 89 at 5–7.

[11] Doc. 93 at 8.

[12] *Id.*

Richardson has one or more prior felony convictions that are highly probative of the felon-in-possession charge in this case.  The parties recognize the appropriate way to introduce evidence of a prior felony is through a stipulation that he had a prior felony conviction at the time he is alleged to have possessed the firearm.[13]  The Court thus relies on the parties to draft an *Old Chief* stipulation.[14]

The government also seeks to introduce evidence that Richardson was on federal supervised release in the District of Kansas during the time period of March to December 2014.  Officers contacted Richardson's probation officer, who identified Richardson from still images of the video-recordings of the informant's buys.  The probation officer in turn shared with officers a March 2014 photograph of Richardson, and photographs of Richardson's numerous body tattoos, which officers compared with the video footage.  The probation officer further confirmed to officers that the telephone number that Richardson provided to the informant was the same telephone number she had on file for Richardson.

This evidence is probative as it explains how officers identified Richardson in the video-recordings of the controlled buys.  This evidence of Richardson's identity is intrinsic to the conspiracy, or alternatively, admissible under Rule 404(b) as evidence of identity.  All of this evidence of identity is highly probative and is not substantially outweighed by its potential for unfair prejudice under Rule 403.

Evidence that the probation officer told officers that Richardson had ceased contact with her after September 13, 2014, is also probative of Richardson's knowledge that he had an

---

[13] *See, e.g.*, *United States v. Silva*, 889 F.3d 704 (10th Cir. 2018) (citing *Old Chief v. United States*, 519 U.S. 172, 175–84 (1997)).

[14] *See Old Chief*, 519 U.S. at 184.

unexecuted arrest warrant from the state court.  Alternatively, it is admissible under Rule 404(b) because it is relevant, and offered to show intent and knowledge.

The appropriate way to explain that Richardson was on supervised release, is to explain that it was tied to the prior felony conviction that the parties stipulate to.  The parties shall include in the *Old Chief* stipulation that Richardson was on supervised release in this District for the prior felony conviction on which the felon-in-possession charge is based, identify the date his term of supervised release began, and stipulate that he was still on supervised release at the time he was arrested on December 18, 2014.

### 3.     Evidence Offered as Intrinsic to the Charges or, in the Alternative, Under Rule 404(b)

As detailed below, the government seeks to admit certain evidence as either intrinsic to the four charges in this case, or alternatively, under Rule 404(b).  Fed. R. Evid 404(b) states in part:

> (1)     Evidence of any other crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

> (2)     [It] may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.[15]

The Court must consider four factors in weighing the admissibility of evidence under Rule 404(b): "(1) whether the evidence is offered for a proper purpose, (2) its relevancy, (3) that the probative value of the evidence is not substantially outweighed by its prejudicial effect, and (4) a limiting instruction is given if the defendant so requests."[16]

---

[15] Fed. R. Evid. 404(b)(1)–(2).

[16] *United States v. Mares*, 441 F.3d 1152, 1156 (10th Cir. 2010) (first citing *Huddleston v. United States*, 485 U.S. 681, 691 (1988); and then citing *United States v. Zamora*, 222 F.3d 756, 762 (10th Cir. 2000)).

However, Rule 404(b) only applies to evidence of acts extrinsic to the crime charged.[17] "Evidence is extrinsic 'when it is extraneous and is not intimately connected or blended with the factual circumstances of the charged offense.'"[18]  Rule 404(b) does not apply to evidence that is considered intrinsic to the crime charged.[19]  Evidence is intrinsic when it is "directly connected to the factual circumstances of the crime and provides contextual or background information to the jury."[20]  The Tenth Circuit counsels that evidence is intrinsic when it:

> • [is] 'inextricably intertwined' with the charged conduct,
>
> • occurred within the same time frame as the activity in the conspiracy being charged,
>
> • [is] a necessary preliminary to the charged conspiracy,
>
> • provide[s] direct proof of the defendant's involvement with the charged crimes,
>
> • [is] "entirely germane background information, . . . 'directly connected to the factual circumstances of the crime,'" or
>
> • [is] necessary to provide the jury with background and context of the nature of the defendant's relationship to his accomplice.[21]

### a.    Evidence that Coconspirators Possessed Firearms During the Conspiracy

The government first seeks to introduce evidence that Richardson's alleged coconspirators possessed firearms during the drug conspiracy.  The informant told officers that

---

[17] *United States v. Oles*, 994 F.2d 1519, 1522 (10th Cir. 1993) (quoting *United States v. Sasser*, 971 F.2d 470, 479 (10th Cir. 1992)).

[18] *United States v. Cushing*, 10 F.4th 1055, 1075 (10th Cir. 2021) (quoting *United States v. Kupfer*, 797 F.3d 1233, 1238 (10th Cir. 2015)).

[19] *Kupfer*, 797 F.3d at 1238 (citing *United States v. Irving*, 665 F.3d 1184, 1212 (10th Cir. 2011)).

[20] *Cushing*, 10 F.4th at 1075–76 (quoting *Kupfer*, 797 F.3d at 1238).

[21] *Kupfer*, 797 F.3d at 1238 (footnotes omitted) (first quoting *United States v. Lambert*, 995 F.2d 1006, 1007 (10th Cir. 1993); and then quoting *Irving*, 665 F.3d at 1212–13).

during drug buys on June 11, June 12, June 24, and July 2, 2014, he saw coconspirators Hall, Vann, Trevillion, Robinson, Hall, and Brownlee possess firearms at various times. As discussed in more detail under the Court's discussion of hearsay objections, because the informant is deceased and unavailable to testify at trial, the evidence of these statements by the informant will not be admitted unless the Court finds that at trial the Government satisfies the requisites for admission of evidence under the forfeiture-by-wrongdoing exception to the hearsay rule.

For purposes of this motion in limine, however, the Court assumes that the evidence concerning the presence of the firearms is admissible, either through some other witness, or in the event the Court determines at trial that the forfeiture-by-wrongdoing exception applies. *If* the evidence is otherwise admissible, the Court finds that it is intrinsic and probative. First, possession of firearms during the drug buys is evidence of acts in furtherance of the conspiracy. Second, it is evidence probative of Richardson's intent in possessing the firearm on December 18, as officers recovered drugs and the firearm from the stolen car Richardson was driving. He is charged with possessing this firearm in furtherance of drug trafficking. The fact that Richardson's coconspirators possessed firearms while selling drugs, including at 1320 Georgia Avenue, provides necessary context to Richardson's possession of drugs and a gun, and is relevant to Richardson's intent in possessing the firearm, particularly since there is evidence that he used the firearm to commit two robberies.[22] The Tenth Circuit has recognized that certain items, like guns, are "tools of the drug trade."[23] Assuming the evidence is otherwise admissible, the Court further finds that under Rule 403, its probative value outweighs any prejudicial effect.

---

[22] *See, e.g.*, *United States v. Winder*, 557 F.3d 1129, 1139 (10th Cir. 2009) ("While a defendant's carrying of a firearm must be directly connected to an underlying drug trafficking offense to satisfy the strictures of § 924(c), we do not require that a defendant's drug dealing activities serve as the only reason for his possession of the gun." (citations omitted))

[23] *Id.* at 1138 (collecting cases finding that firearms, scales, and large sums of cash are tools of the drug trade).

**b.    Richardson was present at a double shooting at 1320 Georgia**

The government seeks to admit evidence that Richardson, Brownlee, and Robinson were present at 1320 Georgia Avenue on June 27, 2014, when police responded to a double shooting at that residence.  This is the same location where the informant allegedly purchased drugs from Richardson once on June 3, and twice on June 5, 2014.  It is also the location where the informant either purchased or attempted to purchase drugs from Vann, Trevillion, Hall, Brownlee, and Robinson.  The double shooting on June 27 is evidence intrinsic to the conspiracy because it involves acts in furtherance of the conspiracy, including the presence of these individuals at 1320 Georgia, the presence of firearms at that location, and the conspirators' intent in possessing the firearms.

Richardson claims that he arrived at the location shortly after the shooting because he was concerned that someone he knew was injured.  Nonetheless, his presence at the location during or after the shootings is probative of his involvement with the other conspirators and his ties to that location.  Even if the evidence is not intrinsic to the conspiracy, it would be admissible under Rule 404(b) to show Richardson's identity, knowledge, and intent, with an appropriate limiting instruction.  In short, the evidence is highly probative, as it places Richardson and the alleged coconspirators at 1320 Georgia close in time to drug buys; and, under Rule 403, the probative value is not substantially outweighed by any undue prejudice from the jury hearing that Richardson was present shortly after the shootings.

**c.    Evidence that Richardson was Involved in the Informant's Murder**

The government seeks to admit evidence that Richardson was involved in the informant's murder on two bases.  First, Richardson is charged with being a felon in possession of the murder weapon on December 13, 2014, the date of the murder.  Second, the government intends

to present evidence that the murder was an act in furtherance of the drug conspiracy that is charged in this case.

Richardson opposes the admission of this evidence, essentially arguing that it is insufficient to prove that he was involved in the murder.  He points to the fact that the state court dismissed the murder charge in 2014 upon a finding of no probable cause.  Of course, this Court necessarily determines the admissibility of the evidence in this case, not based on another court's determination of probable cause.  And the *admissibility* of evidence concerning the murder does not turn on the sufficiency of the evidence; it turns on the *relevancy* of the evidence.

This is in contrast with this Court's determination of whether certain hearsay evidence is admissible under the forfeiture-by-wrongdoing exception to the hearsay rule.  As explained later in this Order, the applicability of the hearsay exception does turn on the sufficiency of the evidence presented at the motions hearing, for that hearsay exception applies only if the government proves Richardson caused or acquiesced in the murder by a preponderance of the evidence, which the government has failed to do.  But the admissibility of Richardson's involvement in the murder for purposes of proving that he was a felon in possession of the firearm on that date does not turn on whether the government presented sufficient evidence at the hearing.  The government has the right to present evidence *at trial* to prove the charge; and the Court must admit evidence that is relevant to the charge.  If the government fails to prove beyond a reasonable doubt that Richardson possessed the weapon on December 13, the Court will necessarily grant a judgment of acquittal on the felon-in-possession charge.  But the Court cannot foreclose the government from presenting evidence on the felon-in-possession charge. Needless to say, the government's evidence at trial may be stronger than it was at the hearing.[24]

---

[24] For that reason, as explained later in this Order, while the Court has ruled that the government may not admit certain evidence under the forfeiture-by-wrongdoing exception to the hearsay rule, the Court acknowledges

Because Richardson is charged with possession of a weapon on December 13 that the government intends to prove was the weapon used to murder the informant on December 13, evidence concerning the murder and Richardson's involvement in the murder is clearly relevant. While this evidence is prejudicial, the probative value substantially outweighs the prejudicial effect given that this is direct evidence of the felon-in-possession charge.

The government offers a second basis to admit evidence of the murder—that the murder of the informant was an act in furtherance of the conspiracy with which Richardson is charged, and thus evidence concerning the murder is intrinsic not only to the felon-in-possession charge, but also to the conspiracy charge. The murder occurred during the time-period of the conspiracy as charged. The murder occurred two to three months after the coconspirators were arrested on warrants with affidavits that revealed it was the same informant who had purchased drugs from them, detailing the dates, locations, amounts of drugs, and monies paid. The murder occurred three months after an arrest warrant was issued for Richardson's arrest, during a time period in which Richardson had eluded arrest on one occasion, and ceased contact with his probation officer. When Richardson was apprehended on December 18, 2014, he attempted to elude arrest again, taking officers on a high-speed chase, struggling and hitting the arresting officer with his baton, and providing false information to the officer on his name and identity. The murder made the informant unavailable to testify against Richardson and the coconspirators in the state court cases and, ultimately, in this case. Under these circumstances, the murder is admissible as evidence of an act in furtherance of the conspiracy.

---

that it may revisit the issue if the government presents stronger evidence at trial that proves by a preponderance of the evidence that Richardson was involved in the murder of the informant.

In *United States v. Portillo-Quezada*, the Tenth Circuit held that evidence a conspirator murdered a person who owed the defendant money from drugs stolen from the defendant was evidence intrinsic to the conspiracy and admissible as direct evidence of the conspiracy.[25]  The court further held that the evidence was properly admitted under Rule 403, as its probative value outweighed the prejudicial effect of hearing about the victim being shot with an assault rifle at close range in a car.[26]  The Tenth Circuit has also recognized "that the scope of the conspiracy is not necessarily limited to a primary goal—such as bank robbery—but can also include secondary goals relevant to the evasion of apprehension and prosecution for that goal—such as escape, or, by analogy, obstruction of justice."[27]  The murder of the informant in this case was consistent with the primary goal of the drug conspiracy—to distribute narcotics and make money—as well as with the secondary goals—to avoid detection and apprehension in order to continue the primary goal.  While this evidence is prejudicial, it is highly probative as direct evidence of the felon-in-possession and conspiracy charges and, thus, is admissible under Rule 403.

> ### d.   Richardson's commission of two armed robberies and high-speed chase

Richardson was not arrested on the state court warrant until December 18, 2014.  The government moves to admit evidence of Richardson's actions the night of December 17 and the early morning hours of December 18 leading to his arrest.  In brief, the government will present evidence that late night on December 17, Richardson robbed an acquaintance at gunpoint with a black assault rifle, then left in a dark-colored vehicle with a loud muffler driven by an unknown person.  About 45 minutes later, Richardson carjacked another victim, brandishing a long, black

---

[25] 469 F.3d 1345, 1352–54 (10th Cir. 2006).

[26] *Id*. at 1354.

[27] *United States v. Cherry*, 217 F.3d 811, 821 (10th Cir. 2000) (citing *United States v. Willis*, 102 F.3d 1078, 1083–84 (10th Cir. 1996)).

gun, taking the victim's Chevrolet Tahoe.  Minutes after this carjacking, an officer responding to a shots-fired call, saw the Chevrolet Tahoe, which had already been reported stolen, and gave chase.  Richardson was driving the stolen vehicle and led officers on a high-speed chase at speeds exceeding 70 mph on snow-packed residential streets in Kansas City, Kansas.  After the vehicle tires blew out from speed sticks placed by other officers, Richardson and his lone passenger, Hamilton, fled on foot, but were quickly apprehended near the stolen vehicle in the early morning hours of December 18.  Officers recovered from the Tahoe: a black assault rifle, crack cocaine, PCP, and two hand-rolled crack cocaine cigarettes, both of which had Richardson's DNA on them.  They also recovered the carjacking victim's wallet and driver's license.

All of this evidence—the two armed robberies, the chase, the recovery of the drugs and weapon, and the cocaine cigarettes bearing Richardson's DNA—are probative of the possession-with-intent-to-distribute-crack-cocaine charge and the associated § 924(c) charge.  This evidence tends to show that Richardson possessed the firearm underlying these charges during the robberies and during the time he drove the car with the firearm and drugs in the car.  The evidence of the robberies and Richardson's possession of the assault rifle is also admissible under Rule 404(b) to prove Richardson's identity and opportunity to possess the weapon.

Further, the evidence that Richardson took officers on a high-speed chase is probative of Richardson's knowledge of the gun and drugs in the car and admissible as evidence intrinsic to the § 924(c) charge, or under Rule 404(b) as evidence of knowledge and intent.  The DNA evidence is intrinsic to the charged offenses because it makes it more likely that the assault rifle and bag of cocaine base in the car belonged to Richardson.  The vial of PCP in the stolen Tahoe is probative of the drug conspiracy charge because the informant and Richardson discussed

"juice" (PCP) during some of their conversations, thus corroborating that Richardson was in the business of selling drugs, could obtain PCP, and had not given up the drug business, as he had claimed to the informant on August 12, 2014.

Moreover, ballistics testing on the firearm evidenced that 15 cartridge casings at the scene of the December 13 murder matched the cartridge casings from bullets test-fired from the gun recovered from the stolen car Richardson was driving when he was apprehended.  This evidence is highly probative of the charge that Richardson was a felon in possession on December 13, when the informant was murdered by someone carrying a dark assault weapon and escaping in a car with a loud muffler.  It is tied not only to the evidence that this weapon was found in the stolen car, but to the evidence that Richardson committed the first armed robbery with a black assault rifle and fled in a car with a loud muffler and that Richardson committed the second armed robbery and carjacking with a long-black gun.  Thus, the evidence of Richardson's two armed robberies, high-speed chase, and apprehension on December 17 through December 18 is highly probative of the felon-in-possession charge and the § 924(c) charge.  Evidence of these other items is inextricably intertwined with the facts of Richardson's arrest and what was found in the stolen vehicle.  Any prejudice to Richardson from the introduction of the evidence of the robberies, high-speed chase, apprehension, and recovery of items in the stolen vehicle does not substantially outweigh the highly probative value of that evidence.  To the extent the Court admits the evidence under Rule 404(b) and not as intrinsic evidence, the Court will give the jury a limiting instruction to ensure that the jury only considers the evidence for the proper purpose.

### B.    Motions Under Authenticity Rules

The government seeks to admit audio-video recordings made by the recorder the informant wore during his controlled drug buys from Richardson and the coconspirators.  The

government also seeks to admit recorded phone calls between the informant and Richardson. Richardson moves to exclude on the basis that the recordings are not authenticated because the government cannot prove that the recordings depict what the government purports them to depict.

Federal Rule of Evidence 901 requires that a party seeking to introduce an item of evidence "must produce evidence sufficient to support a finding that the item is what the proponent claims it is."[28]  With respect to the authenticity of recordings, the Tenth Circuit has adopted a "flexible approach,"[29] in which "no single factor or set of factors is dispositive. Rather, the paramount purpose of laying a foundation is to ensure the accuracy of the evidence in question."[30]  These non-dispositive factors include whether the device is capable of recording the conversation, whether the speakers are identified, and whether the recording has been altered.[31] Rule 901 also provides examples of evidence that satisfies the authentication requirement, which includes "testimony of a witness with knowledge" that the item is what it is claimed to be.[32]

### 1.    Audio-Video Recordings of Controlled Buys

First, the Court easily finds that the recorder was capable of video and audio recording the conduct and conversation occurring during the controlled buys.  The best evidence are the recordings, which the Court has reviewed.  These recordings depict persons engaged in conversation, exchanging money, and exchanging items including at times items that a

---

[28] Fed. R. Evid. 901(a).

[29] *United States v. Green*, 175 F.3d 822, 829–30 (10th Cir. 1999).

[30] *Id*. at 830 (citing *United States v. Smith*, 692 F.2d 693, 698 (10th Cir. 1982)).

[31] *Id*.

[32] Fed. R. Evid. 901(b)(1).

reasonable jury could determine to be drugs.  And the recorder also audio-recorded voices and conversations occurring in the room in which the informant was present.

Second, although the deceased informant cannot testify to the identities of those in the room or those with whom he engaged, the Court is able to discern many of their faces on one or more recordings.  The government intends to present admissible evidence identifying the coconspirators depicted on these recordings.  For example, the government may offer the testimony of Richardson's probation officer, who identified Richardson on the recordings shown to her during the investigation of this case.

Third, Richardson argues that the informant could control where the camera was pointing and what it was capturing and that the recordings did not always capture the informant's hand movements nor the actions of anyone standing next to or behind the informant. To be sure, the recorder only video-recorded that in the camera's eye view; persons or actions occurring outside of the camera's view obviously were not video-recorded.  It is an inherent limitation of body-worn cameras that the recording depicts only what can be captured by the camera.  That limitation, however, does not make the recording less reliable and is not a basis to exclude.

Richardson suggests that the informant may have altered or manipulated the recordings, arguing that there were significant periods of time during the controlled buys that officers did not have eyes on the informant.  But there is a preponderance of evidence that the informant's controlled buys were tightly controlled.  Officer Shane Wright, a 29-year veteran police officer with 17 years of experience in the narcotics unit, was the informant's handler during this investigation.  Wright testified at the hearing that he followed the protocol necessary to ensure that the informant had no drugs or money on him before the buys, so that the informant used money provided by the officers and so that drugs he delivered to the officers immediately after

the buys clearly came from the drug sellers, no other source.  Before each buy, the informant was thoroughly searched for any weapons, money, or drugs.  Wright then provided the informant with the buy money and fitted him with the recorder.  Once the informant was fitted with the recorder, his front-vision perspective, his words, and the visible movements, conduct, and spoken words of those in recording range were captured.

During a buy, although officers lost visual contact once the informant entered the residence or vehicle where the buy occurred, in addition to Wright there were always three to four surveillance officers in the area watching outside and the near vicinity.  The surveillance team members kept an eye on the informant as much as physically possible to ensure his safety, and documented which premises or vehicle the informant entered to conduct the transactions.  Importantly, the recorder allowed these officers to listen to and monitor the informant's controlled buys in real time, so they heard all sounds picked up by the recorder.  Immediately after the drug buy was completed, the informant returned to Wright and surrendered the recording device and the drugs he had purchased, and Wright debriefed the informant.  Wright then reviewed the recording and ensured that the information provided by the informant was accurate; thus, validating the reliability of the informant and the recording itself.  The recorder accurately captured the transactions the officers heard in real time.

Wright further testified that if the informant had turned off the recorder, it would have been obvious when watching the video because the screen would have gone blank. When asked if the informant could have turned the device off and then turned it back on, he stated: "Not easily.  I mean, there is a function on the device.  I don't believe the informant knew where it

was for one thing and where it was positioned.  We would be able to tell if it had been manipulated."[33]

In sum, the Court finds that the government has shown by a preponderance of the evidence that the recordings are authentic.  Richardson argues that only the informant, not Wright, can establish authenticity of the recordings, but the Court disagrees.  Wright took steps to ensure that the recordings matched what the informant advised had happened, thus confirming the informant's veracity and reliability.  Moreover, Wright and the surveillance officers heard in real-time what was occurring, allowing Wright to independently verify that the audio recordings accurately captured what occurred.  This is a sufficient basis under the requisite factors to find that the recordings are authentic under Rule 901.  Of course, Richardson is free to cross-examine officers about the fact that they were not present during the controlled buys and did not personally see what the camera captured.  It is within the purview of the jury to determine how much weight to give that evidence when assessing Richardson's guilt, but it does not render the recordings inadmissible.

### 2.      Recordings of Informant's Phone Calls to Richardson

Richardson similarly challenges the authenticity of recorded phone calls from the informant to him, arguing that Wright cannot identify Richardson as the speaker on the phone calls because he had never met or spoken with him.  The Tenth Circuit has explained that "voice identification testimony is permissible under Rule 901 where there exists 'any basis for identifying the voice,' '[leaving] all questions of weight and credibility for the jury,'" and that

---

[33] Doc. 102 at 83:1–4 (Mot. Hr'g Tr., vol. 1).

"[s]uch voice identification need only rise to the level of minimal familiarity."[34]  For example, in *United States v. Axselle*, this standard of minimal familiarity was met by an agent who listened to a single phone call and compared that with hearing the defendant speak at a court hearing thirty days later.[35]

The government offers that the informant made the calls in the presence of officers and to a number identified as Richardson's—it was the same number Richardson provided to the informant and to his probation officer.  Furthermore, Wright took steps to corroborate the informant's physical description as matching Richardson.  Wright accomplished this by communicating with Richardson's probation officer, who confirmed Richardson's identity with recent photos including photos of his many distinctive tattoos.  Finally, Wright testified that he identified the voice on the recorded phone calls as Richardson's.  Wright testified that he watched the video and audio recordings depicting Richardson, and that he listened to his voice and compared it with the voice on the recorded phone calls.  Wright was able to compare Richardson's voice on the recordings of four controlled buys with his voice on three recorded phone between the informant and Richardson.  This certainly satisfies the standard of minimal familiarity for admissibility of the phone recordings.  Moreover, the government offers that if the Court deems Wright's testimony insufficient, they will call to testify Richardson's probation officer, who had numerous direct dealings with Richardson and can identify both his image and voice on the recordings of the controlled buys and his voice on the recorded phone calls.

---

[34] *United States v. Bush*, 405 F.3d 909, 919 (10th Cir. 2005) (first alteration in original) (quoting *United States v. Watson*, 494 F.2d 1330, 1335 (10th Cir. 1979)).

[35] *See United States v. Axselle*, 604 F.2d 1330, 1338 (10th Cir. 1979).

### C.      Motions Under Hearsay Rules

Rule 801 defines hearsay as a statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."[36]  Hearsay is generally inadmissible,[37] but exclusions and exceptions may apply.[38]  The parties dispute whether several types of recorded and unrecorded statements offered by the government in this case are inadmissible hearsay.  The Court addresses each in turn.

#### 1.      Recorded Statements

Richardson challenges as inadmissible hearsay statements made by him, by the informant, and by others in various recordings of the controlled buys and phone calls between him and the informant.

##### a.      Richardson's Statements

With respect to the recordings of buys or phone calls in which Richardson was involved, Richardson's statements in those recordings are squarely outside of the hearsay rule, as they are statements of a party-opponent.[39]  Rule 801(d)(2)(A) provides that a statement "offered against an opposing party and . . . made by the party in an individual or representative capacity" is not hearsay.[40]  Therefore, Richardson's motion to exclude his own recorded statements is denied.

---

[36] Fed. R. Evid. 801(c).

[37] Fed. R. Evid. 802.

[38] Fed. R. Evid. 802(d), 803, 804, 807.

[39] Fed. R. Evid. 801(d)(2)(A).

[40] *Id.*

### b. Informant's Statements

The informant's recorded statements are admissible to the extent they are not offered for the truth of the matter asserted because statements that are not offered for the truth of the matter asserted are not within the definition of hearsay.[41]  The government posits that "in fact, due to his role as a CI, many of his statements to Richardson in an effort to purchase cocaine base from Richardson, were untrue."[42]  For example, when Richardson asked the informant on July 25 how he had travelled to Richardson's house, the informant lied and said by metro bus.

The government also seeks to introduce the informant's recorded statements to provide context for Richardson's statements.[43]  This is proper, because a recording of a drug transaction, or a recording of a phone call setting up or negotiating a drug transaction that excises the informant's statements might render Richardson's statements incomprehensible.[44]  The recording of the informant and Richardson's statements are therefore admissible.  The Court will give the jury a limiting instruction that they are not to consider the informant's statements for the truth of what the informant says; rather, the informant's statements are to be considered only to the extent they provide context or meaning to Richardson's statements.

---

[41] For this reason, Defendant Richardson's argument is unavailing that admission of these statements implicates his rights under the Confrontation Clause.

[42] Doc. 87 at 10.

[43] The Court declines to find that Fed. R. Evid. 106, commonly called the rule of completeness, is an independent basis for admission of the informant's statements.  The statements are admitted because they are not hearsay, as they are not offered for truth of the matter asserted.

[44] *See United States v. Tangeman*, 30 F.3d 950, 952 (8th Cir. 1994) (finding that the district court did not err in admitting the CI's statements to provide the context for the defendant's statements and not to prove the truth of the matters asserted therein); *United States v. Sorrentino*, 72 F.3d 294, 298 (2nd Cir. 1995) ("The statements of the CI were not offered to prove the truth of the matters asserted but only to render what Sorrentino said in these conversations."), *overruled on other grounds by United States v. Abad*, 514 F.3d 271 (2d Cir. 2008).

Third, the government seeks to admit the statements of the informant and the statements of coconspirators who were present during the recorded controlled buys.  With respect to statements of the informant in recordings of controlled buys from alleged coconspirators, the government does not offer the informant's statements for truth of the matter asserted.  For the reasons explained above, the informant's statements are not hearsay, and the Court will admit the statements with a limiting instruction.[45]

### 3.       Co-Conspirator's Statements

### a.       Standards

With respect to statements made by others during recorded controlled buys, they are admissible if they qualify as coconspirator statements under Rule 801(d)(2)(E).  Coconspirator statements do not constitute hearsay and may properly be admitted if the Court "find[s] by a preponderance of the evidence that (1) a conspiracy existed, (2) the declarant and defendant were both members of the conspiracy, and (3) the statement was made in the course of and in furtherance of the conspiracy."[46]  The government, as the offering party, bears the burden of proving these predicate findings.[47]

In making these predicate findings, the Court may consider evidence that may be otherwise inadmissible, because the determination of whether statements are admissible as

---

[45] *See United States v. Hendricks*, 395 F.3d 173, 183–84 (3d Cir. 2005) ("We thus hold that if a Defendant or his or her coconspirator makes statements as part of a reciprocal and integrated conversation with a government informant who later becomes unavailable for trial, the Confrontation Clause does not bar the introduction of the informant's portions of the conversation as are reasonably required to place the defendant or coconspirator's nontestimonial statements into context."); *United States v. Ailsworth*, 948 F. Supp. 1485, 1490 (D. Kan. 1996) (finding statements of confidential informant captured on audiotape and videotape offered only as context for statements of defendant and his coconspirators were not hearsay as they were not offered for truth of the matter asserted).

[46] *United States v. Rutland*, 705 F.3d 1238, 1248 (10th Cir. 2013) (citing *United States v. Urena*, 27 F.3d 1487, 1490 (10th Cir. 1994)).

[47] *United States v. Perez*, 989 F.2d 1574, 1577 (10th Cir. 1993) (en banc) (citation omitted).

coconspirator statements is the type of preliminary question concerning the admissibility of evidence that is not itself subject to the rules of evidence, except those rules of evidence concerning privileges.[48]  The Tenth Circuit has held that under the Supreme Court's decision in *Bourjaily v. United States*[49] "there [must] be some independent evidence linking the defendant to the conspiracy," but it "need not be 'substantial.'"[50]  "Testimony of a government agent regarding his interactions or conversations with coconspirators is adequate independent evidence."[51]

In the Tenth Circuit, "a district court can only admit coconspirator statements if it holds a *James* hearing or conditions admission on forthcoming proof of a 'predicate conspiracy through trial testimony or other evidence.'"[52]  While a *James* hearing is not required, the Tenth Circuit has expressed a "strong preference for *James* proceedings."[53]  The government presented evidence, including independent evidence, at the hearing on the parties' motions in limine. Based on this evidence, the Court determines that a separate hearing is not necessary here. Based on the evidence presented by the government at the hearing, the Court finds by a preponderance of the evidence that a conspiracy existed, that Richardson and the declarants were members of the conspiracy, and that statements by Richardson and the coconspirators relating to arranging drug transactions, statements made during drug transactions, and statements

---

[48] *United States v. Owens*, 70 F.3d 1118, 1124 (10th Cir.1995) (citing *Bourjaily v. United States*, 483 U.S. 171, 177-181 (1987)); Fed. R. Evid. 104(a).

[49] 483 U.S. 171, 180 (1987).

[50] *United States v. Alcorta*, 853 F.3d 1123, 1142 (10th Cir. 2017) (citing *United States v. Owens*, 70 F.3d 1118, 1124–25 (10th Cir. 1995)).

[51] *United States v. Stein*, 985 F.3d 1254, 1269 (10th Cir. 2021) (citing *Owens*, 70 F.3d at 1125).

[52] *United States v. Townley*, 472 F.3d 1267, 1273 (10th Cir. 2007) (quoting *Owens*, 70 F.3d at 1123; *see generally United States v. James*, 590 F.2d 575 (5th Cir. 1979) (en banc) (setting forth *James* hearing procedure for determining whether the court should admit coconspirator statements as nonhearsay under Rule 801(d)(2)(E)).

[53] *Townley*, 472 F.3d 1273 (quoting *United States v. Gonzalez–Montoya*, 161 F.3d 643, 648 (10th Cir. 1998)) (further citations omitted).

identifying a fellow coconspirator were made in furtherance of the conspiracy were made in the court of and in furtherance of the conspiracy.  To the extent the government offers other types of coconspirator statements at trial, the Court reserves ruling on the in-furtherance requirement until the government identifies such statements.

**b.        Existence of Conspiracy and Membership**

The government must first show by a preponderance of the evidence that a conspiracy existed.

> To prove a conspiracy existed, the district court must find by a
> preponderance of the evidence that (1) there was an agreement to
> violate the law, (2) the declarant knew the essential objectives of
> the conspiracy, (3) the declarant knowingly and voluntarily took
> part in the conspiracy, and (4) the coconspirators were
> interdependent.[54]

As proof of the existence of the conspiracy and Richardson's and the declarants' membership in the conspiracy, the government points to: statements made by coconspirators to the informant; statements made by Richardson to the informant; actions of conspirators, including actions of Richardson and other members of the conspiracy as depicted in the audio-video recordings of the controlled buys; and phone records showing substantial phone contacts between Richardson and Vann, and Richardson and Trevillion.

On June 3, 2014, the informant first went to a house at 1047 Quindaro but was told by persons at that house that "they" are selling at a different house.  Those persons then escorted the informant to 1320 Georgia, where the informant made a controlled buy of crack cocaine from Richardson and coconspirator Durayl Vann.  The recording depicts Richardson holding what

---

[54] *United States v. Rutland*, 705 F.3d 1238, 1249 (10th Cir. 2013) (citing *United States v. Ailsworth*, 138 F.3d 843, 850–51 (10th Cir. 1998)).

appears to be a baggie of crack cocaine; Richardson hands the baggie to Vann, who opens it and hands pieces to the informant. Vann then closes the baggie and hands it back to Richardson.

Later that same day, June 3, the informant returned to 1320 Georgia and made another controlled buy of crack cocaine from Richardson. The recording depicts Vann and others present during that buy. The informant made controlled buys of crack cocaine from Richardson on June 5 and from Vann on June 10, both buys at 1320 Georgia. During the June 10 controlled buy, a male is depicted cutting the cocaine into pieces. On June 11, the informant met Vann at 1320 Georgia but did not buy any crack cocaine because Vann was only selling small pieces. Coconspirator Hall was present and holding a rifle. On June 24 the informant made a controlled buy at 1320 Georgia from coconspirators Trevillion, Hall, Robinson, and Brownlee who pooled crack cocaine to sell a larger quantity to the informant. Twice on July 2, the informant made controlled purchases of crack cocaine from Trevillion in a car parked in front of 1727 Cleveland; Hall was present during both transactions, displaying a weapon during the second transaction. On July 25, the informant made a controlled buy of crack cocaine from Richardson at 2305 N. 56th Street, a location Richardson moved to after the shootings at 1320 Georgia. On July 28, the informant placed a recorded phone call to Richardson asking about buying PCP. The following day, on July 30, in another recorded phone call, Richardson told the informant "it was all bad" and he couldn't figure out why. And on August 12, the informant placed another recorded phone call to Richardson, who told him that he was no longer selling drugs. On August 14, Richardson told the informant, in an unrecorded encounter, to go buy drugs from Cole. [55] The informant promptly made controlled buys of crack cocaine from Cole and Brown on August 15 and 16.

---

[55] The Court again notes that in its foundational determination of the admissibility of statements under Rule 801(d)(2)(E), the Court may consider hearsay statements that may be inadmissible at trial, such as summary testimony from a case agent, or, as in this case, statements made by the now deceased informant.

The video recordings themselves evidence Richardson and Vann working in concert on one of the June 3 buys.  Others are depicted acting in concert as well, such as cooking and cutting cocaine.  On June 24, four coconspirators pooled crack cocaine to supply the informant with a larger quantity.  It is apparent from the recordings that Richardson and the others were working together and working interdependently to distribute crack cocaine.  Most of this activity took place at a common location, 1320 Georgia, where Richardson operated until he moved to another location after the shootings.  Although Richardson later claimed to no longer be selling drugs, he directed the informant to Cole, who promptly sold drugs to the informant in three controlled buys.   Furthermore, there are phone records evidencing that from June to September 2014, there were 54 phone contacts between Richardson and Trevillion and 14 phone contacts between Richardson and Vann.

This evidence sufficiently establishes, by a preponderance of the evidence, that Richardson was engaged in a conspiracy with others to distribute crack cocaine and possess with intent to distribute crack cocaine and that the members of the conspiracy were interdependent.  It is not necessary that a defendant know all the details or all the members of a conspiracy.[56]  And his participation in the conspiracy may be slight and inferred from his actions, so long as the evidence proves a connection to the conspiracy.[57]

"A person is a member of a conspiracy if he was aware of the common purpose, willingly participated in the conspiracy, and intended to advance the purpose of the conspiracy."[58]  A person need not be formally charged to be a member of a conspiracy for purposes of this

---

[56] *United States v. Caro*, 965 F.2d 1548, 1556 (10th Cir. 1992).

[57] *Id.*

[58] *Rutland*, 705 F.3d at 1251 (citing *United States v. Suntar Roofing*, 897 F.2d 469, 474–75 (10th Cir. 1990)).

analysis.[59]  The Court finds by a preponderance of the evidence that Richardson was a member

of the conspiracy, along with Vann, Trevillion, Brown, Robinson, Cole, Brownlee, and perhaps

others, to distribute and possess with intent to distribute crack cocaine.

### c.        In-Furtherance Requirement

As the Tenth Circuit has explained:

> [T]he in-furtherance requirement of the Federal Rules of Evidence,
> . . . "embodies the drafters' desire to strike a balance between the
> great need for conspirators' statements in combating undesirable
> criminal activity which is inherently secretive and difficult of
> proof, and the need to protect the accused against idle chatter of
> criminal partners as well as inadvertently misreported and
> deliberately fabricated evidence."  A wide array of statements can
> fit this requirement, including those made "to induce enlistment or
> further participation in the group's activities; . . . to prompt further
> action on the part of conspirators;   . . . to reassure members of a
> conspiracy's continued existence; . . . to allay a co-conspirator's
> fears; and . . . to keep co-conspirators abreast of an ongoing
> conspiracy's activities."[60]

The Court finds by a preponderance of the evidence that statements by Richardson and the

coconspirators relating to arranging drug transactions, statements made during drug transactions,

and statements identifying a fellow coconspirator are statements made in furtherance of the

conspiracy.  These types statements are therefore admissible non-hearsay under Rule

801(d)(2)(E).  To the extent the government intends to offer other types of statements under this

hearsay exception, the Court reserves ruling on the in-furtherance requirement subject to the

government identifying such statements.

---

[59] *United States v. Durland*, 575 F.2d 1306, 1309–10 (10th Cir. 1978).

[60] *United States v. Alcorta*, 853 F.3d at 1137 (quoting *United States v. Perez*, 989 F.2d 1574, 1578 (10th Cir. 1993)).

### d.    Relevance

Relatedly, Richardson challenges the admissibility of buys in which he was not present, not on hearsay grounds, but on grounds of relevancy.  But these buys are relevant as overt acts in furtherance of the conspiracy in which Richardson is charged and are thus highly probative and admissible.  For a defendant charged in a conspiracy is responsible not only for his own actions, but the actions of his coconspirators so long as those actions are reasonably foreseeable to him.[61] Furthermore, Richardson challenges the admissibility of one of the recorded buys because the state court found no probable cause underlying a charge on that buy.  But Richardson is not substantively charged with any of the buys in this case.  Even if he were, that is no basis to exclude evidence in this case.  There is no doctrine of collateral estoppel in this situation; the sufficiency of evidence presented in state court is irrelevant to the sufficiency of evidence presented in federal court; the cases are prosecuted by two separate sovereigns.

### 2.    Informant's Unrecorded Statements to Law Enforcement Officers

The government seeks admission of unrecorded statements the informant made to law enforcement during the investigation.  After each controlled buy, Wright debriefed the informant, who described what had transpired during the controlled buy, including details that may not have been visible on the recordings of the buy.  For example, the informant advised Wright when he observed firearms present and who he observed in possession of the firearms. The informant presumably made statements to officers at other times during the investigation, including in their sessions preparing him for each controlled buy.  Also, the informant made statements to Wright about an encounter the informant had with Richardson at a funeral when law enforcement officers were not present.  The informant stated that he saw Richardson at a

---

[61] *Pinkerton v. United States*, 328 U.S. 640, 647 (1946).

funeral, asked Richardson about buying drugs, and Richardson directed him to buy drugs from Cole, providing the informant with Cole's contact information. Acting upon this information, Wright directed the informant to make controlled buys from Cole.

Given that the government seeks to offer these statements of the informant for the truth of the matter asserted, they are inadmissible hearsay unless an exception to the hearsay rule applies. The government asserts that the evidence is admissible under one of two exceptions: (1) the residual exception; and (2) the forfeiture-by-wrongdoing exception.

### a.       Residual Exception

The government argues that the statements are admissible under Rule 807, the residual exception to the hearsay rule. The residual exception provides:

> [A] hearsay statement is not excluded by the rule against hearsay even if that statement is not admissible under a hearsay exception in Rule 803 or 804 if: (1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.[62]

Given the lack of analysis offered by the government, including how the residual exception applies when the Confrontation Clause is implicated, the Court declines to apply it here.

### b.       Forfeiture-by-Wrongdoing Exception

The government also argues that these statements are admissible under Rule 804(b)(6), the so-called forfeiture-by-wrongdoing exception to the hearsay rule. This unavailability applies to: "[a] statement offered against a party that wrongfully caused—or acquiesced in wrongfully

---

[62] Fed R. Evid. 807(a).

causing—the declarant's unavailability as a witness, and did so intending that result."[63]  The rules of evidence specifically prohibit a windfall to someone who has caused the unavailability of a witness or acquiesced to the same, and carve out an explicit exception to the hearsay rule to prevent it.  The Tenth Circuit has held that a defendant is deemed to have waived his Confrontation Clause rights if the government proves by a preponderance of the evidence that "(1) he or she participated directly in planning or procuring the declarant's unavailability through wrongdoing, or (2) the wrongful procurement was in furtherance, within the scope, and reasonably foreseeable as a necessary or natural consequence of an ongoing conspiracy."[64]

The government argues that this hearsay exception applies to the informant's statements because (1) Richardson either murdered or aided and abetted the murder of the informant, or (2) a coconspirator murdered the informant, an act within the scope of the drug conspiracy and reasonably foreseeable to Richardson such that Richardson has *Pinkerton* liability for the murder.   The government has the burden of proving by a preponderance of the evidence that this rule applies because Richardson caused or acquiesced in the murder of the informant.[65]  And the government must further prove by a preponderance of the evidence that Richardson caused or acquiesced in the informant's murder with the intent of preventing him from testifying.[66]  The courts of appeal that have decided the issue have concluded that the defendant can have mixed motives, but one of the reasons has to be to prevent the declarant from being available.[67]

---

[63] Fed. R. Evid. 804(b)(6).

[64] *United States v. Cherry*, 217 F.3d 811, 820 (10th Cir. 2000) (citations omitted).

[65] *See id.*

[66] *See id.*

[67] *See United States v. Roberts*, 84 F.4th 659, 668 (6th Cir. 2023) (reasoning that requiring the exclusive motive be to make the declarant unavailable "would undercut the equitable nature" of the forfeiture-by-wrongdoing exception); *United States v. Cazares*, 788 F.3d 956, 975 (9th Cir. 2015) (the government need not show the defendant's sole purpose was to silence the declarant); *United States v. Jackson*, 706 F.3d 264, 267 (4th Cir. 2013) ("We find no support in controlling precedent for Jackson's restrictive view of the forfeiture-by-wrongdoing

As more fully detailed in the Factual Background, the government's evidence is that the informant was killed on December 13 by a tall, black male with a deep, raspy voice, who appeared at the front door of the informant's residence, asking for the informant by name.  The informant's girlfriend and son did not recognize the shooter by appearance or voice.  The shooter was taller than the informant, who was at most 5'8".   Their very general descriptions match Richardson, a tall black male.  After discharging the firearm and leaving 16 cartridge cases behind at the murder scene, the shooter fled outside and jumped in a dark car with a loud muffler.  A person outside described seeing a tall male departing as the passenger in the car with a loud muffler.  The informant's girlfriend heard the car with the loud muffler outside as well.

At the time of the murder, Richardson had a motive to kill the informant, if he knew that the informant was responsible for the charges and arrests of Vann, Trevillion, Cole, Hall, Brown, Brownlee, and Robinson and/or knew the informant was responsible for the charges against him.  There is circumstantial evidence that Richardson and the others knew or surmised as much, especially given that the warrants disclosed the dates and locations of the drug sales and the affidavits disclosed that it was the same informant who purchased the drugs each time.  Moreover, there is circumstantial evidence that Richardson had guilty consciousness or knowledge that there was a pending arrest warrant on him—he eluded officers on September 13, cut off contact with his probation officer in September, and attempted to flee from officers on December 18.

---

exception, and, in accord with several other courts that have addressed the issue, we decline to provide criminal defendants with an opportunity to avoid the exception by adducing some additional motive for their misconduct."); *United States v. Martinez*, 476 F.3d 961, 966 (D.C. Cir. 2007) (noting that imposing an exclusive-intent requirement would have the "perverse consequence . . . of allowing criminals to murder informants and thereby prevent admission of the informants' statements—just so long as the criminal could show that the intent was retaliation (which the criminal almost always could do")).

At the time of the murder, Richardson had the opportunity to kill the informant.  Most of the coconspirators had no opportunity for they were detained on the charges arising from their sales to the informant.  Richardson, Brownlee, and Robinson were not in custody.  But neither Brownlee nor Robinson matched even the very general description of the shooter.  Brownlee was not a tall, black male; she was a female short in stature.  Robinson was very tall and very thin, a body-type not consistent with the general descriptions given by the eyewitnesses.

Although officers were unable to lift fingerprints or DNA from the informant's door, there is one piece of evidence that ties Richardson to the murder scene.  The assault rifle that was recovered from the stolen vehicle Richardson was driving on December 18 was ballistically tied to the murder weapon.  A forensics ballistic examiner determined that 15 of the cartridge casings left at the murder scene bore toolmarks that matched the toolmarks on a cartridge case expelled when the recovered firearm was test fired.  The sixteenth cartridge recovered from the murder scene bore toolmarks that indicated that it had cycled through but was not fired from the assault rifle recovered on December 18.  Richardson and Hamilton, his passenger, jointly occupied the stolen vehicle when officers apprehended them on December 18.  But less than two hours before their apprehension, Richardson committed two separate armed robberies.  The robbery victims' description of his firearm matched the firearm recovered from the stolen vehicle.  The victims' stolen monies were recovered from Richardson.  In fact, Richardson does not dispute his involvement in these robberies, having entered a nolo contendere plea to both of them, and having stipulated to those convictions during the hearing to revoke his federal supervised release. Finally, there is the getaway car—eyewitnesses at the murder scene described a dark car with a loud muffler, and, four days later, victim R.S. described Richardson hopping into a dark car with a loud muffler after he robbed R.S.

While the government is not held to proof beyond a reasonable doubt that Richardson caused the murder, it must prove this by a preponderance of the evidence for the Court to apply the forfeiture-by-wrongdoing exception.  The Court finds that the government has not proved by a preponderance of the evidence that Richardson caused the informant's murder.  There is certainly circumstantial evidence, but it does not prove that it is more likely than not that Richardson was the gunman.  First, there is no solid eyewitness identification of Richardson at the murder scene.  Their descriptions—a tall black male with a deep raspy voice—are too general to bear much evidentiary weight.  The murder and R.S. robbery getaway vehicle may well have been the same, a dark vehicle with a loud muffler.  But there is no evidence that Richardson owned, drove, or otherwise exercised control of that vehicle on December 13 or December 17.  On December 13, the gunman was a passenger in the vehicle, as was Richardson on December 17.   There is no evidence that Richardson owned the assault rifle, or that he exclusively exercised dominion or control over the weapon.[68]  In other words, another tall black male could have used that same weapon on December 13, with or without Richardson's knowledge.  At the limine hearing there was simply no evidence presented tying Richardson to that weapon continually, much less continuously.  There is no evidence that Richardson possessed or even jointly or constructively possessed that weapon during any of the controlled buys, for example.

Furthermore, there is no evidence that the gunman was a coconspirator.  The only evidence of someone else being in possession of the assault rifle was on December 18.  When officers finally stopped the stolen vehicle driven by Richardson, they found the assault rifle

---

[68] *See United States v. Little*, 829 F.3d 1177, 1181–82 (10th Cir. 2016) (citing Henderson v. United States, 575 U.S. 622, 626–27 (2015)) ("[C]onstructive possession requires both power to control an object and intent to exercise that control.").

wedged between the front console and the passenger seat where Hamilton sat. But there is no evidence that Hamilton was a member of the conspiracy. And with respect to the members of the conspiracy that the government has identified, most of them were in custody and could not have killed the informant. As the government posits, only Robinson and Brownlee were not in custody, but neither of them match the general description of the shooter, only Richardson does.

Nor is there evidence that Richardson procured the murder or aided and abetted the gunman. There is no evidence that Richardson provided the firearm to someone for them to kill the informant. Moreover, even if there were evidence that Richardson killed the informant, or aided and abetted the murder, or that a coconspirator killed the informant, there is no evidence on this record that the informant was killed to make him unavailable to testify. That might be a reasonable inference; but there is no evidence that Richardson or anyone else threatened the informant or spoke about their desire to prevent the informant from cooperating or testifying.

On this record, the Court simply cannot find that the government has proven by a preponderance of the evidence that Richardson murdered the informant, or procured or aided and abetted the gunman. Nor has the government shown by a preponderance of the evidence that a coconspirator murdered the informant within the scope of the conspiracy in which it was reasonably foreseeable to Richardson that the murder would occur, and in furtherance of the conspiracy.[69]

This does not mean, as discussed below, that the Court is excluding evidence of the murder, for two reasons. First, should the government present stronger evidence at trial that rises

---

[69] *See United States v. Cherry*, 217 F.3d 811, 821 (10th Cir. 2000) ("[W]e hold that participation in an ongoing drug conspiracy may constitute a waiver of constitutional confrontation rights if the following additional circumstances are present: the wrongdoing leading to the unavailability of the witness was in furtherance of and within the scope of the drug conspiracy, and such wrongdoing was reasonably foreseeable as a 'necessary or natural' consequence of the conspiracy.").

to the level of preponderance of evidence, the Court will revisit this issue of the applicability of the forfeiture-by-wrongdoing exception.  Second, the evidence of the murder itself is probative of one of the charges against Richardson, being a felon-in-possession on December 13, the date of the murder.

The parties spent considerable time briefing whether the forfeiture-by-wrongdoing exception applies to a defendant who has not directly caused or procured the unavailability of the declarant but has *Pinkerton* liability based on being a member of a conspiracy responsible for the declarant's unavailability.  In *Crawford v. Washington*, the Supreme Court held that the forfeiture-by-wrongdoing exception constitutes a waiver by a defendant of their Confrontation Clause rights.[70]  In *United States v. Cherry*,[71] the Tenth Circuit held that "the acquiescence prong of Rule 804(b)(6), consistent with the Confrontation Clause, permits consideration of a Pinkerton theory of conspiratorial responsibility determining wrongful procurement of witness unavailability."[72]

But in *Giles v. California*, which was decided after *Crawford* and *Cherry*, the Supreme Court revisited the intent element of the rule, holding that the forfeiture-by-wrongdoing exception only applies if the defendant caused the absence of the witness with the intent to prevent the witness from testifying.[73]  It further explained that the forfeiture-by-wrongdoing exception survives *Crawford* because *Crawford* recognized it as a historical common-law

---

[70] 541 U.S. 36, 61–62 (2004) ("[T]he rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds; it does not purport to be an alternative means of determining reliability."))

[71] 217 F.3d at 819–20 ("[W]e hold that participation in an ongoing drug conspiracy may constitute waiver of constitutional confrontation rights if the following additional circumstances are present: the wrongdoing leading to the unavailability of the witness was in furtherance of and within the scope of the drug conspiracy, and such wrongdoing was reasonably foreseeable as a "necessary or natural" consequence of the conspiracy).

[72] *Id.*

[73] 554 U.S. 353, 377 (2008).

exception to the Confrontation Clause.[74]  *Giles* has called into question the continued viability of waiver-by-acquiescence of Confrontation Clause rights because of language in *Giles* indicating that the government must prove the defendant intended to cause the witness's absence, and because *Pinkerton* liability was *not* recognized under common law at the time of the founding.[75]

## III. Conclusion

The Court concludes that the following evidence is admissible, subject to the limitations set forth below, and subject to any further contemporaneous objections on grounds other than those raised in the parties' motions and briefing:

(1)     The testimony of Special Agent Matthew Spaeth is admissible, except he may not testify to matters not within his personal knowledge;

(2)     Richardson's prior felony conviction, provided the parties submit an *Old Chief* stipulation that sets forth that he was convicted of a felony in the District of Kansas on the prior date.   The parties should include in the stipulation that Richardson was on federal supervised release on that prior conviction during the times relevant to the charges in the Indictment;

---

[74] *Id.*

[75] *See United States v. Brown,* 973 F.3d 667, 699–702 (7th Cir. 2020) (explaining that under a strict reading of *Crawford* and *Giles*, the use of *Pinkerton* liability to satisfy the intent requirement in the forfeiture-by-wrongdoing exception may no longer be good law, noting that the other post *Giles* cases that allow Pinkerton liability to satisfy the forfeiture-by-wrongdoing test do not analyze whether *Pinkerton* liability was recognized at common law, and stating that *Giles* laid out a strict historical test for the Confrontation Clause in only recognizing exceptions that existed at the founding.); *cf. United States v. Dinkins*, 691 F.3d 358, 384 (4th Cir. 2012) (holding that conspiratorial liability satisfies the forfeiture-by-wrongdoing intent requirement, such that a defendant will be found to have the requisite intent to prevent the witness from testifying if it was within the scope of the conspiracy, without discussing whether *Pinkerton* liability was recognized at founding,); *United States v. Cazares*, 788 F.3d 956, 975 (9th Cir. 2015) (same).

(3)      The audio/video recordings of the buys and the audio recordings of the informant's phone calls because they satisfy the authenticity requirement for admissibility;

(4)      Richardson's statements on recordings or otherwise as statements by a party-opponent;

(5)      The informant's statements on the recordings because they are not offered for the truth of the matter asserted;

(6)      The statements of coconspirators under Rule 801(d)(2)(E) relating to arranging drug transactions, statements made during drug transactions, and statements identifying a fellow coconspirator are statements made in furtherance of the conspiracy.  To the extent the government intends to offer other types of statements under this hearsay exception, the Court reserves ruling on the in-furtherance requirement subject to the government identifying such statements.

(7)      Evidence that the conspirators possessed firearms during the course of the conspiracy because it is intrinsic to the conspiracy, except to the extent the evidence is based on statements of the informant to law enforcement that are inadmissible under the residual exception or the forfeiture-by-wrongdoing exception in Rule 804(b)(6);

(8)      Evidence that Richardson was present at a double shooting at 1320 Georgia and evidence of Richardson's commission of armed robberies and high-speed chase because they are intrinsic to the conspiracy or, in the alternative, under Rule 404(b); and

(9)     Evidence concerning the murder of the informant because it is intrinsic to the

felon-in-possession charge.

The following evidence is inadmissible:

(1)     Richardson's pending charges in Case No. 22-20054-DDC, and his detention in

this case and that case;

(2)     The informant's statements to law enforcement offered under the residual

exception to the hearsay rule; and

(3)     The informant's statements to law enforcement offered under the forfeiture-by-

wrongdoing exception to the hearsay rule, subject to the Court revisiting the issue

if the government presents stronger evidence at trial showing by a preponderance

of the evidence that the requirements of Rule 804(b)(6) are met.

**IT IS THEREFORE ORDERED BY THE COURT** that the government's Motion in

Limine (Doc. 87) is **granted in part and denied in part**.

**IT IS FURTHER ORDERED** that Richardson's Motion in Limine (Doc. 89) is **granted**

**in part and denied in part**.

**IT IS SO ORDERED.**

Dated: March 6, 2024

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE